Tom HELLMAN, Edwin Egli, Terry Schantz, Harvey Wehri, Paul Wehri, Alvin Kottenbrock, Keith Krein, Kevin Krein, Don Baesler, Waldemar Alt, John Meyer, Dwayne Egli, Ron Egli, Henry Schatz, Jr., Walter Gietzen, Western Livestock Auction, Inc., Napoleon Livestock Auction, Wishek Livestock Market, Stockmen's Livestock Exchange, Inc., Turtle Lake Sales Pavilion, Kist Livestock Auction Co., Herreid Livestock Market, Lemmon Livestock, Inc., and Farmers Livestock Exchange of Bismarck, Inc., Plaintiffs, Appellants and Cross-Appellees,

v.

Lawrence THIELE and Donald Lembke, d/b/a Thiele Cattle Company, Defendants and Appellees,

and

Security State Bank of New Salem, Antone Goetz, Allyn Lennie, and Delores Maier, Defendants, Appellees and Cross-Appellants.

Civ. No. 11323.

Supreme Court of North Dakota.

Sept. 29, 1987.

Vogel Law Firm, Mandan, for plaintiffs, appellants and cross-appellees; argued by Jos. A. Vogel, Jr.

Calvin J. Hoovestol, Waconia, Minn., for defendants and appellees.

Lindquist and Vennum, Minneapolis, Minn., and Wheeler, Wolf, Peterson, Schmitz, McDonald and Johnson, Bismarck, for defendants, appellees and cross-appellants; argued by J. Michael Dady. Appearance by Albert A. Wolf.

ERICKSTAD, Chief Justice.

The plaintiffs appeal from an order denying their motion to amend the complaint and from a partial summary judgment dismissing some of their claims against Security State Bank of New Salem, Antone Goetz, Allyn Lennie, and Delores Maier [hereinafter collectively referred to as "the Bank"]. The Bank filed a cross-appeal. We affirm the order denying the motion to amend the complaint; affirm that part of the judgment which dismisses claims of the plaintiffs; dismiss that part of the cross-appeal which challenges denial of summary judgment; and remand for further proceedings.

This case arises from the ill-fated relationship between the Bank and Lawrence Thiele and Donald Lembke, doing business as Thiele Cattle Company ["Thiele"].[1] Thiele maintained a business checking account at the Bank. Between 1979 and 1984 Thiele routinely purchased cattle with checks which created substantial overdrafts in its account, and, although there were exceptions, the Bank covered most of the overdrawn checks.

Fifteen of the plaintiffs are farmers and livestock producers who sold cattle to Thiele. The remaining nine plaintiffs are livestock auction markets and sales barns which sold cattle to Thiele. They allege

---

1. Thiele sued the Bank in a separate action, alleging that the Bank had breached an agreement to cover Thiele's overdraft checks. *See* *Thiele v. Security State Bank of New Salem,* 396 N.W.2d 295 (N.D.1986).

that the Bank engaged in a pattern of paying Thiele's overdrafts, knowing Thiele was insolvent, in an effort to keep the business afloat long enough for the Bank to become fully secured on its various loans to Thiele. According to the plaintiffs' theory, the Bank accomplished this by withdrawing $1,000 per week from Thiele's checking account to pay other loans. The plaintiffs further allege that once the Bank reached a position of full security on its loans it abruptly quit paying Thiele's overdrafts, leaving them holding approximately $447,000 of worthless checks drawn on Thiele's account.

The plaintiffs sued the Bank,[2] alleging fraud, breach of a contract made for their benefit as third-party beneficiaries, failure to give notice of dishonor before its midnight deadline, and negligence. The plaintiffs subsequently moved to amend their complaint to include a separate claim based upon the Bank's alleged violation of the lending limit statute, Section 6–03–59, N.D. C.C. The trial court denied the motion, holding that there was no private right of action under the statute against a bank by a creditor of the bank's customer. The court did indicate, however, that evidence of a violation of the statute might be relevant to the other claims for relief.

Because the trial court had permitted the plaintiffs to amend other aspects of their complaint, the plaintiffs filed an amended complaint. This amended complaint, rather than pleading violation of the lending limit statute as a separate cause of action, included allegations of the violation within the cause of action for fraud. The Bank refused to answer these paragraphs of the amended complaint, claiming that the amendments went beyond the scope of the court's order allowing amendment. The plaintiffs brought a second motion to amend. The court again denied the motion, stating that it viewed the proposed amend-

ment as an attempt to establish that violation of the statute constituted fraud *per se.*

The Bank moved for summary judgment. The trial court granted summary judgment dismissing all of the plaintiffs' claims except fraud. On the fraud count, the court denied summary judgment as to six plaintiffs[3] who had communicated with the Bank regarding Thiele's financial status. The court granted summary judgment on the fraud count against the remaining eighteen plaintiffs, who had had no contacts with the Bank regarding Thiele's financial status. The court expressly determined that there was "no just reason for delay" and pursuant to Rule 54(b), N.D.R.Civ.P., directed the entry of a final judgment.

The plaintiffs appeal, alleging that the court erred in granting summary judgment and in denying their motion to amend the complaint. The Bank has filed a cross-appeal, contending that the court erred in denying their motion for summary judgment on the fraud claim by the remaining six plaintiffs and in refusing to award attorneys fees under Section 28–26–31, N.D. C.C.

## I. DENIAL OF MOTION TO AMEND

The plaintiffs contend that the trial court erred in denying their second motion to amend the complaint. The proposed second amended complaint would have added four paragraphs detailing their allegation that the Bank exceeded its legal lending limit to Thiele on 367 separate occasions. They contend that violation of the lending limit, although not fraud *per se,* is evidence of "fraudulent intent and conduct on the part of the Bank."

Amendment of pleadings is governed by Rule 15, N.D.R.Civ.P. A motion to amend a pleading is submitted to the "informed, careful judgment and discretion of the trial court," and we will not reverse an order denying a motion to amend absent an abuse of that discretion. *E.g., Galloway v.*

---

**2.** The plaintiffs also sued Thiele. Their separate claims against Thiele are not involved on appeal.

**3.** The six plaintiffs left in the case were Stockmen's Livestock Exchange, Inc.; Lemmon Live-

stock, Inc.; Western Livestock Auction, Inc.; Farmers Livestock Exchange of Bismarck, Inc.; Herreid Livestock Market; and Napoleon Livestock Auction.

*Forum Publishing Co.,* 138 N.W.2d 798, 801 (N.D.1965).

The court's two orders on the motions to amend, when read together, indicate that the court did not prohibit the plaintiffs from introducing evidence of a violation of the statute, but only held that violation of the statute did not create either a private right of action or, standing alone, a cause of action based upon fraud.

In its order on the first motion, the court held that a bank customer's creditor could not maintain a private right of action against the Bank for violation of the lending limit statute. The plaintiffs did not appeal from this order, nor do they challenge this conclusion on appeal. The court went on, however, to clarify that evidence of a violation of the statute might be relevant in connection with the other claims for relief.

On the second motion to amend, the trial court viewed the proposed amendment as an attempt to establish that violation of the statute constituted fraud *per se:*

"The proposed amendment, in essence, alleges that exceeding the lending limit amounts to fraud. I do not agree. The proposed amendment is therefore denied."

We do not find that the court abused its discretion in denying the motion to amend, particularly when viewed in the context of its earlier statement that evidence of a violation of the lending limit statute might be relevant in connection with the other

claims. The plaintiffs concede that violation of the statute is not fraud *per se,* and the court's orders apparently would permit them to introduce evidence of a violation if it aids in establishing one of the elements of fraud.[4]

## II. SUMMARY JUDGMENT

All of the plaintiffs contend that the trial court erred in granting summary judgment dismissing their claims for breach of contract, and those plaintiffs whose fraud claims were dismissed contend that the court erred in dismissing their fraud claims.

Summary judgment is a procedural device available for the prompt and expeditious disposition of controversies without trial when, after viewing the evidence in a light most favorable to the opposing party and giving that party the benefit of all favorable inferences, there is no genuine dispute as to either the material facts or the inferences to be drawn from undisputed facts. *Hillesland v. Federal Land Bank Association of Grand Forks,* 407 N.W.2d 206, 210 (N.D.1987).

### A. Breach Of Contract Intended To Benefit The Plaintiffs

■ The plaintiffs contend that they were the intended third-party beneficiaries of a contract between the Bank and Thiele whereby the Bank agreed to pay all of Thiele's overdrafts.[5] They further claim

---

**4.** As to those plaintiffs whose fraud claims were dismissed on summary judgment, there is apparently some confusion regarding whether the trial court considered their allegations of lending limit violations when it dismissed their claims. These plaintiffs contend that the court did not consider the allegations when it dismissed their fraud claims, whereas the Bank contends that these allegations were included in the complaint which was before the court at the time it granted summary judgment. Although it is clear that the court had denied the amendment to include specific allegations of violation of the statute, it is not entirely clear whether the court considered the proffered evidence of violation as tending to establish any of the elements of fraud. Because we conclude *infra* that summary judgment was appropriate even if the alleged lending limit violation is taken into con-

sideration, we find it unnecessary to determine whether the trial court considered it.

**5.** For the purpose of this appeal we will assume that there was such a contract between the Bank and Thiele, because we are required to view all factual disputes in the light most favorable to the party opposing summary judgment. *Everett Drilling Ventures, Inc. v. Knutson Flying Service, Inc.,* 338 N.W.2d 662, 664 (N.D.1983). We note, however, that in the litigation between the Bank and Thiele it was determined that no such contract existed. *See Thiele v. Security State Bank of New Salem,* 396 N.W.2d 295 (N.D.1986). Because we conclude that the plaintiffs were not third-party beneficiaries of such a contract if one existed, we need not address the issue of collateral estoppel.

that they are entitled to damages for breach of that contract by the Bank.

Section 9–02–04, N.D.C.C., provides:

"*Third-party beneficiary may enforce contract.*— A contract made expressly for the benefit of a third person may be enforced by him at any time before the parties thereto rescind it."

We have construed this statute to mean that a party only incidentally benefited by performance of a contract is not entitled to maintain an action to enforce it:

"Section 9–02–04, N.D.C.C., has been construed many times. In *Parlin v. Hall,* 2 N.D. 473, 52 N.W. 405, 407 (1892), this court said:

" ' . . . The mere fact that one not a party to an agreement may be benefited by its performance does not bring him into contractual relations with the promisor in the agreement. He must have been the party intended to be benefited by the promise, and there must have existed at the time thereof such an obligation on the part of the promisor towards the third person as gives him at least an equitable right to the benefits of the promise. . . . '

"This court said in Syllabus No. 4, *Farmers' State Bank v. Anton,* 51 N.D. 202, 199 N.W. 582 (1924):

" 'The mere fact that a third party may derive a benefit, purely incidental and not within the contemplation of the parties, from the performance of a contract, does not entitle him to maintain an action thereon in his own name within the provisions of section 5841, Comp.Laws 1913, giving the beneficiary the right to enforce a contract made expressly for his benefit.' "

*First Federal Savings and Loan Association of Bismarck v. Compass Investments, Inc.,* 342 N.W.2d 214, 218 (N.D. 1983).

The plaintiffs in this case do not allege any special circumstances which demonstrate that the Bank and Thiele expressly intended the contract to provide a benefit to them in more than an indirect manner. The plaintiffs claim that the mere fact that they were paid by checks which would have been returned for insufficient funds absent the agreement renders them the intended beneficiaries of the agreement. It is clear that the contract, if any, was for the primary benefit of the Bank and Thiele, and any benefit flowing to those third parties who were payees on Thiele's checks was purely incidental. We conclude that the trial court did not err in granting summary judgment on this issue.

**B. Fraud**

■ Those plaintiffs whose fraud claims were dismissed allege that the trial court erred in granting summary judgment dismissing their claims. They assert that material issues of fact remain regarding their allegation that the Bank created a misrepresentation by failing to disclose to them Thiele's precarious financial condition.

Initially we note some confusion on the part of the plaintiffs regarding the nature of their claim against the Bank. They state in their brief on appeal that "[t]he gravamen of Plaintiffs' Third Claim for Relief is that the Bank Defendants committed actual and constructive fraud as defined in Sections 9–03–08 and 9–03–09, N.D. C.C." Sections 9–03–08 and 9–03–09 provide:

"9–03–08. 'Actual fraud' defined.— Actual fraud within the meaning of this title consists in any of the following acts committed by a party to the contract, or with his connivance, with intent to deceive another party thereto or to induce him to enter into the contract:

"1. The suggestion as a fact of that which is not true by one who does not believe it to be true;

"2. The positive assertion, in a manner not warranted by the information of the person making it, of that which is not true though he believes it to be true;

"3. The suppression of that which is true by one having knowledge or belief of the fact;

"4. A promise made without any intention of performing it; or

"5. Any other act fitted to deceive."

*"9–03–09. 'Constructive fraud' defined.*— Constructive fraud consists:

"1. In any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault or anyone claiming under him, by misleading another to his prejudice or to the prejudice of anyone claiming under him; or

"2. In any such act or omission as the law specially declares to be fraudulent without respect to actual fraud."

Both of these provisions are included in Chapter 9–03, N.D.C.C., entitled "Consent." Section 9–03–08, by its express language, applies only to "acts committed by a party to the contract ... with intent to deceive another party thereto or to induce him to enter into the contract." These provisions clearly apply only to misrepresentations between parties to a contract. They have no application where, as in this case, there is no contract between the parties.

What the plaintiffs have in fact attempted to plead is a tort action for deceit, which is governed by Sections 9–10–02, 9–10–03, and 9–10–04, N.D.C.C. Section 9–10–03 provides that one who willfully deceives another with the intent to induce him to alter his position is liable for any resultant damages. The relevant definition of "deceit," for purpose of this case, is contained in Section 9–10–02(3), N.D.C.C., which provides:

*"9–10–02.      Deceit—Definition.*— A deceit within the meaning of section 9–10–03 is:

\*      \*      \*      \*      \*      \*

"3. The suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or"

In an early case construing this provision, this court made it clear that a party is liable for nondisclosure under the statute only if he had a duty to disclose the true facts:

"The fact that plaintiff has suffered loss as a result of the defendant's action or omission to act does not necessarily give the plaintiff a cause of action against the defendants to recover damages. There must not only be a loss, but the loss must be proximately traceable to the defendant's breach of a legal obligation which he owed to the plaintiff."

*Hart v. Evanson,* 14 N.D. 570, 575–576, 105 N.W. 942, 943 (1895).

The rule is the same under Section 551(1) of the Restatement (Second) of Torts (1977):

"(1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question."

The United States Court of Appeals for the Third Circuit has discussed the application of Section 551 in a case presenting a factual situation very similar to this case. In *Chrysler Credit Corp. v. First National Bank and Trust Co. of Washington,* 746 F.2d 200 (3d Cir.1984), Chrysler alleged that the bank had engaged in fraud by not earlier stopping a dealer from "kiting" checks. The court stated:

"Chrysler alleges that First National engaged in fraud by permitting the dealer to perpetuate a check kiting scheme. If the bank had stopped the scheme, plaintiff argues, checks would have been returned to Chrysler Credit due to insufficient funds in the Al Barry, Inc., account and Chrysler Credit would have discovered the financial problems at the dealership at an earlier time, thereby preventing further losses. In short, plaintiff seeks to hold First National liable for nondisclosure of a customer's poor financial condition.

"Pennsylvania law does not impose an affirmative duty on a bank to disclose to the world a customer's financial condition. Section 551 of the Restatement of Torts, Second, accords liability for nondisclosure only if the parties are engaged in a business transaction or stand in a fiduciary relationship. *Matter of Real*

*Estate License v. Commonwealth,* 47 Pa.Commw. 236, 407 A.2d 922 (1979). Here, First National and Chrysler Credit were not involved in a business transaction, nor a fiduciary relationship. The bank's nondisclosure to Chrysler Credit did not constitute fraud because Chrysler Credit was not a party to whom the bank owed a duty of disclosure under Pennsylvania law." *Chrysler Credit Corp., supra,* 746 F.2d at 207.

The Appellate Court of Illinois has reached a similar result in a case brought by plaintiff farmers who sold grain to an insolvent elevator, Williams. *Abell v. First National Bank in Shawneetown,* 153 Ill. App.3d 946, 106 Ill.Dec. 884, 890, 506 N.E.2d 684, 690 (1987). The farmers sued two banks which, they alleged, had paid Williams's overdrafts to create an appearance of solvency. The court concluded, however, that the defendant banks owed no duty to the farmers to disclose Williams's financial situation:

"The crux of plaintiffs' case is that the banks' conduct contributed to Williams' appearance of solvency and contributed to his ability to pay for grain already received so that the plaintiff farmers would be induced to continue to deliver grain to him. Plaintiffs urge that 'but for' the defendants' wrongful conduct, plaintiffs would not have delivered their grain to Williams. See *Adam v. Mt. Pleasant Bank and Trust,* (Iowa 1986), 387 N.W.2d 771, 776.

\* \* \* \* \* \*

"[P]laintiffs were unaware of and unconcerned with Williams' banking practices. Plaintiffs' answers to interrogatories indicate that neither defendant made oral or written representations to any plaintiff concerning the financial condition of Williams. In addition, the defendants were not guarantors of Williams in his business transactions; and neither had a fiduciary relationship with plaintiffs or any duty toward plaintiffs regarding Williams' financial conditions. An analogous issue was considered by the court in *Popp v. Dyslin,* (2d Dist.1986), 149 Ill.App.3d 956, 102 Ill.Dec. 938, 500

N.E.2d 1039, in which the court was faced with the necessity of determining whether a bank was liable to creditors of a borrower to whom the bank allegedly negligently misrepresented the financial qualification of its borrower.

\* \* \* \* \* \*

"Based upon the rationale of *Popp,* we conclude that defendants owed no duty to communicate to plaintiffs any information that they may have had concerning Williams' financial condition if they did, in fact, have such information. See generally Restatement (Second) of Torts §§ 551, 552 (1977). See also *Chrysler Credit Corp. v. First National Bank and Trust Co. of Washington,* (3d Cir. 1984), 746 F.2d 200, 207." *Abell, supra,* 106 Ill.Dec. 890, 506 N.E.2d at 690.

Similarly, the plaintiffs in this case seek to hold the Bank liable for its failure to disclose to them Thiele's insolvency, yet they cite no statute, rule, or other authority whatsoever which indicates that the Bank had a duty to do so. Only if such a duty existed can the Bank be held liable under Sections 9–10–02 and 9–10–03, N.D. C.C., for its failure to disclose Thiele's financial condition to the plaintiffs.

The plaintiffs allege that the court found a party liable for fraud under similar circumstances in *Sutliff, Inc. v. Donovan Companies, Inc.,* 727 F.2d 648 (7th Cir. 1984). In *Sutliff,* the parties were five oil wholesalers. Two companies, Donavon and Garrow, allegedly entered into a scheme to persuade a third company, Sutliff, to sell oil to them below its cost. They allegedly were able to accomplish this because Mrs. Sutliff, the operator of the company, was "psychologically incapacitated" at the time. Donavon and Garrow also allegedly lent small sums of money to Sutliff to give it an appearance of solvency, and thereby induce the two remaining oil wholesalers, Ellingsen and Land O'Lakes, to extend credit to Sutliff.

When the scheme collapsed, Sutliff, Ellingsen, and Land O'Lakes sued Donavon and Garrow, alleging antitrust violations and civil RICO (Racketeer Influenced and Corrupt Organizations, Title IX of the Or-

ganized Crime Control Act of 1970, 18 U.S.C. §§ 1961–1968) claims. The district court dismissed the complaint for failure to state a claim. The Court of Appeals reversed, holding that the complaint did state a claim under RICO.

We believe *Sutliff* is clearly distinguishable from the instant case. There were allegations that Garrow had made express statements to Ellingsen that Sutliff was solvent. Furthermore, the court made it clear that the "fraud" committed by the defendants involved "a 'pattern of racketeering activity' (in the special sense in which the RICO statute uses those words)," and that their conduct constituted fraud in violation of the mail and wire fraud statutes. *Sutliff, Inc., supra,* 727 F.2d at 653. Finally, the complaint in *Sutliff* alleged that the defendants had "acquired control of Sutliff," "conducted its affairs," and "infiltrated Sutliff and used it as a tool to defraud it and the other defendants [plaintiffs]." *Sutliff, Inc., supra,* 727 F.2d at 653. Clearly, where a party has "infiltrated" a company, "acquired control," and "conducted its affairs," the party may well owe a "duty" to those dealing with the target company which the party would not otherwise have.

We are not faced with a RICO claim, nor a claim under the mail or wire fraud statutes. Nor are there allegations that the Bank took "control" of Thiele's business. We are presented with a claim alleging deceit by nondisclosure under Sections 9–10–02 and 9–10–03, N.D.C.C., which clearly require that the defendant have a duty to disclose as a prerequisite to liability. No such duty has been established by the plaintiffs.

The plaintiffs further claim that their allegations of fraud are supported by the evidence of the Bank's violation of the lending limit statute. They allege that the lending limit violation, while not evidence of fraud *per se,* is evidence of "fraudulent intent and conduct on the part of the Bank." In support of this assertion they rely on two decisions of the Supreme Court of Iowa in connected cases, *Countryman v. Mt. Pleasant Bank & Trust Co.,* 357 N.W.2d 599 (Iowa 1984), and *Adam v. Mt. Pleasant Bank & Trust Co.,* 387 N.W.2d 771 (Iowa 1986).

In *Countryman, supra,* farmers who had sold grain to an insolvent elevator sued the elevator, Prairie Grain Company, and its bank, alleging a conspiracy to defraud them. They also alleged violations of numerous banking statutes, including a limitation on the amount which could be loaned to a bank director. The trial court instructed the jury that violation of any of these statutes constituted a "fraudulent practice."

On appeal from a jury verdict for the farmers the supreme court reversed, holding that there was no implied right of action for violation of the statutes and that violation of the statutes did not "in and of itself" establish a conspiracy to defraud. *Countryman, supra,* 357 N.W.2d at 606–607. The court did indicate, however, that evidence of violation of the statutes would be relevant upon remand to the issues of the nature of the bank's relationship with Prairie Grain and the bank's knowledge and intent. On remand the plaintiffs again prevailed, and the bank appealed. In *Adam, supra,* the supreme court reiterated much of its holding in *Countryman* while concluding that the verdict was supported by substantial evidence.

We believe that a careful reading of *Countryman* and *Adam* demonstrates that they are wholly inapplicable to the instant case. Those cases were based upon allegations that the bank and Prairie Grain had acted in concert, engaging in a conspiracy to defraud the farmers. The factual circumstances bear out this assertion. The owner of Prairie Grain, Raymond Keller, was a director of the bank. The farmers alleged that, through a conspiracy with the president of the bank, Prairie Grain and the bank conducted an elaborate scheme to create an appearance of solvency so that farmers would continue to extend credit to and store grain with Prairie Grain until Keller and the bank president could sell their bank stock. Under these allegations, it was not incumbent upon the farmers to show that the bank had an independent duty to inform them of Prairie Grain's financial condition. By acting in concert

with Prairie Grain, the sufficient nexus between the bank and the farmers was established.

The plaintiffs in this case do not allege a conspiracy or concert of action between the Bank and Thiele. In fact, they concede that none existed. Thus, in order to recover from the Bank the plaintiffs must establish an independent duty owed to them by the Bank.

Evidence of a lending limit violation does not establish such a duty. The plaintiffs argue that the lending limit violation is evidence of fraudulent intent. Intent is not, however, the element of deceit which is missing in this case. The missing element is duty on the part of the Bank to inform the plaintiffs of Thiele's financial condition. We conclude that the Iowa cases are inapposite.[6]

Because the plaintiffs have failed to establish that the Bank had a duty to inform them of Thiele's financial condition, we conclude that the trial court did not err in granting summary judgment dismissing the deceit claims of those plaintiffs who had no communication with the Bank.

## III. CROSS–APPEAL

The Bank has filed a cross-appeal, alleging that the trial court erred in failing to grant summary judgment dismissing the fraud claims of the six plaintiffs who communicated with the Bank regarding Thiele's financial condition, and in failing to award attorneys fees against the plaintiffs pursuant to Section 28–26–31, N.D.C.C.

### A. Denial of Summary Judgment

■ The Bank has attempted to cross-appeal from that portion of the judgment which denied its motion to dismiss the fraud claims of the six remaining plaintiffs. An order or judgment denying a motion for summary judgment is not appealable, nor is it reviewable upon appeal from a partial judgment involving other aspects of the case. *Herzog v. Yuill*, 399 N.W.2d 287,

292–293 (N.D.1987). To the extent that the Bank's cross-appeal challenges the denial of summary judgment, it is dismissed.

### B. Attorneys Fees

The Bank on its cross-appeal challenges the trial court's failure to award attorneys fees pursuant to Section 28–26–31, N.D. C.C. Although this issue was presented to the trial court, the court did not rule on it; therefore, we have nothing to review on appeal. Given the procedural history of this case (entry of a partial judgment with a Rule 54(b) order), we assume that the trial court reserved the issue of attorneys fees for later disposition. The trial court will be able to resolve the issue of attorneys fees upon remand.

We affirm the order denying the motion to amend the complaint; affirm that part of the judgment which dismisses claims of the plaintiffs; dismiss that part of the cross-appeal challenging the denial of summary judgment; and remand for further proceedings. All parties shall bear their own costs on appeal.

GIERKE, VANDE WALLE, LEVINE and MESCHKE, JJ., concur.

---

**6.** We also note that the Appellate Court of Illinois has expressly declined to follow the Iowa cases in *Abell v. First National Bank in Shawneetown*, 153 Ill.App.3d 946, 106 Ill.Dec. 884, 506 N.E.2d 684 (1987). In a very similar factual situation, including allegations of conspiracy to defraud, the court held that a bank had no duty to disclose the financial condition of its customer to the customer's creditors.